Chicago Park District Chicago Park So the thing about 403, I'll just say for start, is that this is a discretionary call for the district judge. The district judge has been there for the trial. It's inherently something that requires the exercise of judgment. It, by definition, applies to relevant evidence that could come in, and the judge has to decide whether there's a risk that it'll be, you know, it should stay out anyway, even though it's conceitedly relevant. So you really need to, you have a couple of barriers to overcome. First of all, we review only for abuse of discretion. The judge has told us. He thinks in the end, you know, if there was this one sentence that you just quoted in the audio, the judge doesn't think that made any difference. Why is he wrong? Who are we to say he's wrong about that? We don't believe it was harmless error. We believe that it shows the investigator's feelings towards Ms. Vega, even though there's nothing discriminatory about what they said regarding her. It was not about race, but it certainly shows a hostility, and even though Title VII doesn't look at hostility to infer discrimination, we don't think it should have been put in front of the jury because they can certainly infer something from that that was not. But even so, you think it changed the outcome of the trial. Let's assume, I mean, as Chief Judge Woods said, your barrier to showing that the district judge made a 403 error is high because of the standard of review. But then you have to show that it was prejudicial, and I don't think your brief did a very fulsome job of showing why the result of the trial would have been different if the jury hadn't heard that snippet, which wasn't introduced for substantive evidence. Well, I think it shows that there was hostility, and I do believe that hostility was one of the factors that the court found supported the jury's verdict. But the judge might have thought that this was just sort of a harsh remark that was made. I mean, I've certainly heard a lot worse things than that sentence. I'm sorry to say, I wish that weren't the case. But the judge might have thought in the realm of nasty remarks, this one was at the mild end. Well, but they still found hostility, and he still agreed that it was hostile behavior that supported the finding of discrimination. But not just based on that one remark. It was based on a huge number of things. I don't know if he elicits exactly what it was based on in his opinion, but we believe that that shouldn't have been shown. I mean, hostility is not a support for discrimination. No, that's true. No one disagrees with you on that. Before you run out of time, could you address your remitter and your tax arguments? I want to flesh out a little bit why you think the award should be remitted further, below the $300,000. So the award is $300,000. The only evidence regarding emotional damages for compensatory was the testimony of Ms. Vega herself saying that she was upset, she had felt bad because she had nowhere to go, and she thoughtlessly stared out a window. And her diabetes flared up, and she went to see the doctor. But I believe the evidence shows that the diabetes was flaring up way before her termination. Maybe so, but she did testify to that. What worries me here, it seems to me that implicit in your argument is the notion that in situations where Congress or the relevant legislature has imposed a statutory cap, all damage awards have to be somehow allocated, like from zero to $300,000. And I don't think that's the law. I think the law is the jury awards what it wants to, but there's a hard ceiling on it. And so you're going to find a lot of cases at the cap, some more serious than others, because the increasing amount of damages above the cap is now unavailable. I don't disagree with you. I don't think this proportionality rule exists. I don't believe that's what I'm doing here. What I'm saying is that her testimony, uncooperated by a friend, anybody. Where's the corroboration requirement? Where's the corroboration requirement? You make the same point in the mitigation of damages that the only testimony about what she did to mitigate damages was hers, and therefore it was insufficient. Why is it insufficient? We allow people to be convicted of serious crimes and sent to prison on the testimony of a convicted perjurer. Why is the testimony of a non-felon insufficient in civil litigation? I believe the case law has said with regards to compensatory damages that $300,000 is mildly... No, I wish you would address my question. You are saying in different places throughout your brief that the evidence is insufficient because it is just the testimony of the plaintiff. And I'm trying to figure out what rule of law says that the testimony of the plaintiff is not sufficient, if believed by the jury. There is no rule of law, Your Honor. There is no such rule. Correct. There just isn't. Correct. I believe the other issue you wanted to talk about was... The tax calculation. The tax calculation. So the tax calculation is kind of an interesting thing. There was no testimony during the equitable hearing about a tax calculation. We're not sure how that figure was arrived at. I thought it was in the supplemental briefs that were permitted by the district court after that hearing that you're referring to. But it was a tax table that was submitted and the statement that Ms. Vega has never paid any taxes, which we obviously disagree with. As her employer for a very long time, we withheld taxes. And then she got refunds. We don't know that. There's no evidence in the record that she got refunds. I have no idea how this... Our point with the tax component is we have absolutely no idea how this was calculated. It's not that she got a tax component that we have a problem with. It's the fact that we don't know how it was done. Well, we can ask your opponent. I mean, I understood from the briefs in this case that in the supplemental briefing, the calculations showing what the tax consequences to her of the lump sum payment in one particular tax year would be, what was necessary by the time you work through the tax tables to offset that, and that was what was done. I mean, it's not the world's most complicated calculation. So anyway, if you'd like to save a little bit of time for rebuttal, that would be fine. I would, Your Honor. I know you're sitting into it. Thank you very much. At this point, I will save my remaining six minutes for rebuttal. Thank you. Okay. Thank you. Sure. All right. Ms. Simmons-Gill. Thank you. May it please the Court? Counsel? My name is Catherine Simmons-Gill. I represent the plaintiff, Cross Appellant Lydia Vega. We are before you here today on a jury verdict for plaintiff. The jury heard the defendant's version of the facts that you have heard today but credited plaintiff's version. The jury looked at the totality of evidence as required by Ortiz v. Werner and found that defendant would not have terminated plaintiff had she not been Hispanic. The jury verdict should be respected. So can I ask you, just because we were just talking about it, to respond to Ms. McGarry's arguments about the tax portion of this judgment? Of course, Your Honor. Your Honor, Ms. Vega produced full tax returns for her highest earning tax years, 2010, 2011, 2012. In those years, while the Park District took out federal taxes, she did not pay federal taxes as her tax returns show. She testified that in the years following. When you say she didn't pay, does that mean that the withholding satisfied her tax obligation or that she was somehow in a low enough bracket that she just actually had a tax of zero? It was all refunded. She had a difficult building that she was managing and three dependents at the time who were requiring support. So a lot of deductions. A lot of deductions, disabled mother, and also the evidence showed that many Park supervisors spent their own funds for Park District things that happened. If there were no hot dogs or not enough hot dogs and they couldn't get in a form on time, they just went out and spent their own money. The union testified many Park supervisors did that, so there were some deductions for unreimbursed business expenses. Did the district court ever explain how it calculated the tax offset? No. The district court did not calculate the tax offset. On page 47 of the appendix, there's this list of things with no apparent explanation how they were derived. Some of them were explained someplace else, like where the $300,000 cap comes from, but I couldn't find any place where the tax award was calculated. The plaintiff calculated the tax award? No, look. Please respond to my question. Did the district judge explain how he calculated it? He explained that he accepted the calculations of plaintiff, I believe, Your Honor. In his—I can bring it back to you if you— I can bring it back to you on rebuttal, Your Honor, but he said— And we're supposed to assume that the district court was just stamping approved on the plaintiff's submissions? We've had some pretty nasty things to say about that. So this footnote on page 47 says, the court finds the explanation plaintiff provided in her supplemental memoranda, ECF numbers 299 and 311, sufficient to support these awards. And that's a footnote at the end of E. So presumably, since awards is plural, he's talking about anything in this list. Again, pretty thin. I mean, rubber stamps are a little troublesome. That included the tax award, and we submitted not only a static Excel spreadsheet showing our computations and the bases, but a manipulable Excel spreadsheet. So I don't know what the judge did, but perhaps he or his clerks went through all those calculations. But didn't explain why he found them persuasive, and so it gives us nothing to review. Except your submission below. That's right. The calculations are in the record below, Your Honor. We did not, of course, file online the manipulable spreadsheet, but we filed the PDF spreadsheet showing our calculations. But the district judge didn't say why it was accepting your submissions, simply that it found them persuasive. I grant your motion for summary judgment because I find your arguments persuasive without explaining why. Except this was not summary judgment. This was a specific calculation where he had the spreadsheets to work with. I cannot tell you what the judge did. Yeah, but it's not a jury award. It's a decision made by a judge. Correct. And normally, when a judge makes a decision, we require findings of fact and conclusions of law. The defendants had some objections to the plaintiff's tax calculations, and I can't find any place where the district court dealt with them. Only in the footnote just read by? No, it's not a place where the district court dealt with objections. There is no reasoning in that footnote. None. The district court did review the objections that defendants applied  How specific were the defendants' objections? Did they just say, we don't think there should be a tax offset? They said two things. We don't think there should be a tax offset. They said these numbers are wrong or that calculation is wrong. So you would have served your supplemental memo on them. We did. They said we don't understand the calculations. The district court said, I do understand the calculations, implying or inferring that he did review the calculations in the Excel spreadsheet and adopt them. So I'm just wondering, it's a problem that he doesn't explain, but if they didn't focus on anything that was particularly wrong, like our records show that your salary this year was different or, you know, something. We think you made a mathematical error. We don't like the way you set up the equations or some kind of objection. If they didn't point to anything specific, then they themselves may have foregone the opportunity to criticize. They did not point to anything specific. The only thing they pointed to was what they have argued today, that we deducted federal taxes. There is evidence in the record that in the years that they deducted federal withholding taxes, she did not. It was refunded to her. That would be reflected on her full tax returns for 2010, 11, and 12. Because that would be shown as a payment. And then there would be an offset for the deductions. Yes, that was shown. That is in the evidence. Those were their only objections. They just said, we don't understand the calculations. So there was no objection to specific numbers. They said there's just one tax sheet. Well, by that time, the IRS for high-income earners had one page that listed tax brackets. You know, above $300,000, it's this. And above $400,000, it's this percent. And above $600,000, that's what the IRS regulations were at that point on paying taxes. And that's what we submitted. That's what they were, one page. I have a different thing I wanted to talk to you about. And I'm not sure how you've organized this, but let me just jump to it anyway. On your Section 1983 cross-appeal, I have a problem with your argument that Mr. Simpkins is a policymaker. Because we've had a lot of cases where people can be the final decision-maker, such as the principal of a high school, but the principal of the high school is not the ultimate policy authority. It's the school board. And I see Mr. Simpkins very much like that. He's a person with a great deal of authority in the Park District. But he's not the final policymaker in the Monell sense of the term, as I look at this record. You can tell me why I'm wrong, but I'm concerned about that. I understand, Your Honor. Let me try to answer that. There was a jury verdict for plaintiff on this. There is an assumption that plaintiff— sorry, that the jury followed its instructions to find— But that instruction, I don't— you know, if it's a patterned instruction, I apologize. I think that instruction is very muddled when you look at Monell itself, at the three different possible ways you can identify something as— I'll just call it the municipality's, the entity's own policy. That's the critical thing you have to find for Monell. And this sort of blended custom and policymaker in a way that struck me is unfortunate. I think that the jury found either that the pattern and practice of discrimination against Hispanics at the Park District was so blatant that a policymaker must have known. But why does a policymaker have to— the point about the custom is that this is just the widespread way these people run themselves. You don't have to then nail it down. At least in the original language of Monell, the Supreme Court doesn't say anything about that. So I don't know where that came from. Probably something unfortunate we said at some point. I'm sorry. The jury instruction at the time, including— although it's the patterned instruction from the circuit, the advice and the footnotes has changed. The jury instruction did not require us or the court to identify a specific policymaker at the time. I believe that the jury could definitely have zeroed in on Mr. Simpkins because he had unfettered authority to terminate. But that's my principal example. I mean, in the general law of Monell, although such people have a great deal of authority, the fact is, just to take the Chicago Public Schools as my example, the principals are the captains of the school, but it's the school board for Monell purposes, which is where you need to locate the policy. And it can either be expressed or it can be a widespread custom. You can't just write some words down on paper and never do that, you know, so people can show custom. Or, as in the VODAC case, I mean, there are some instances—in that instance, it was the chief of police. But maybe we're using the term policymaker in two different ways. I don't know. It's a very confusing thing. But my feeling is that Simpkins would never qualify as a policymaker under Part III of Monell. There's another way to put this. We're going to hear argument later today in two cases. There's been talk about termination in this case. We're going to hear argument later today in two cases where there was an actual termination, where the police shot and killed someone, terminated with extreme prejudice. But that doesn't make the police officer on the street a policymaker, even though no one higher up in the police force can bring the victim back to life. The argument here seems to be that Simpkins must be a policymaker because he could make an effective decision. Now, of course, there was the personnel board, but is there anything beyond the ability to make an effective decision or to shoot to kill that makes Simpkins a policymaker? I believe so, Your Honor. The Park District is unusual. It is not like the Chicago public schools or the police department. All discipline, all hiring, all terminations flow through very few people under the director of human resources, Mr. Simpkins. The personnel board consists of three people, and statutorily, Mr. Simpkins is one of those people. But could be outvoted if it's a three-person board, and his decisions are subject to review by this administrative review board. They are not subject to review only if it's not mandatory. They are not always reviewed. They are only reviewed if someone chooses to request review on a due process basis. Well, but that doesn't mean that there isn't review. I'm going to say, speaking from personal experience, that this court's decisions are not commonly reviewed, but every so often the Supreme Court decides to review one of them, so it means that we are not necessarily the last voice. I understand, Your Honor. Even though it's discretionary and all those all sorts of things, you know, we can't control it. There is no evidence in the record that any decision of the personnel board has ever reversed a decision of Mr. Simpkins or the director of human resources, that it is like the Valentino case where he effectively controls who is hired and who is fired. I think he is a de facto policymaker, and I think the jury saw that, and that's what it found. Can you talk about remitter? Yes, Your Honor. Your Honor, Ms. Vega. While you're taking a sip, I'll just say, you know, one of the cases that you point to as a comparable is this Farfara's case where the award was $200,000, and obviously $300,000 is significantly more than that, and comparable awards are not determinative and all of that. Your Honor, I can only say that the plaintiff did not put a figure before the jury. Three times the defendant put the $750,000 figure before the jury. Where did that come from? Is that a complaint? There was a pretrial order suggesting a range of compensatory damages, and I think that was in there. But the plaintiff never suggested that the jury should decide on a particular figure. The defendant did. So once the time for trial comes, whether it's plaintiff, the source of that number in the pretrial order, or defendant, or the judge, or somebody, but once the trial commences, you're saying the plaintiff never uttered a particular number. It did not, Your Honor, not once. It left it to the discretion of the jury, and I think the jury was in the best position here, reviewing all the evidence and the demeanor of the witnesses and the humiliation that Ms. Vega was subjected to and her difficulties specifically. The jury decided on the figure, and plaintiff's health was significantly affected by defendant's actions. Not only did her diabetes become uncontrollable, but for the first time ever, she developed high blood pressure and high cholesterol, which they finally got under control after she was terminated. She was stuck with Medicaid, which changed her medications, her chronic medications, every month, depending on what was cheapest. She was very worried about supporting her disabled mother, and as I reported, her building had its own difficulties. She loved the park. She loved her park. She took it from a wasteland to a community center, and it's like she lost her life. She lost her vocation. She reported that in driving home that day, she was so shocked, she had to pull over to the side of the road because she couldn't figure out exactly where she was, even though she'd driven it every day for years. For a while, all she could do was get up and kind of stare out the window, and even at trial, while she had recovered substantially, she was working, she was getting her degree, there was residual effect. What they did to her was humiliating and horrible, and she experienced tremendous physical and mental pain. I think that's why the judge, credit when he remitted, remitted to the cap. So I would ask that the court here follow the suggestion of the jury who was in the best possible position to review, and we are a few years away from coronavirus. Maybe there's been inflation. Is there anything else you'd like me to address, Your Honor, particularly? May I address the waiver issue? You can address the waiver issue. If you want to say anything about these video clips, since we did spend some time talking about that. Your Honor, I would first like to say that those clips are not before this court. Defendants did not bring them before this court, even the admitted clips. They were clips. They were furnished to the defendant a couple of days before the trial in their edited format. They were both on a USB stick and on a disc, so in two formats. And even earlier than that. And was there ever an objection under Rule 403? Not that I recall, Your Honor. I don't recall every line. Certainly the appellant did not attach a ruling by the district court responding to such an objection. And I assume, given our circuit rules, that if there were such a ruling, it would be there. I believe it would be, Your Honor. Was there an objection to their authenticity? Two of them were authenticated by Officer Catlin, Officer Hester. So, no, there was no objection specifically to authenticity, and the court ordered them to bring in the originals if they had an objection and show how these. I mean, we had hundreds of video clips on 25 discs. We pulled out 12 from days for which she was terminated and the first day for which she was surveilled in September. And we asked the officers about those things. Mr. Catlin authenticated both of his tapes from September 27, 2011, and Officer Hester, who had authenticated all of them at his deposition, refused to authenticate them. So they were used solely for impeachment. Were they edited solely for length? They weren't even edited for length. They were just the ones for those days were pulled out. That's exactly right. There was one snippet on December 2 that went on for hours where they're chasing her car and she's not driving it. We showed some of that and then we moved forward, but we didn't show an hour of following a car around that she was not driving. We just showed it for the purpose of— But you didn't alter them or change them or put different people— Not in any way, Your Honor. And there was no objection to that effect? Mr. Court ordered them to bring in the originals to show that there was any alteration, and they did not. So your point is they had the opportunity. If there had been some concern about alteration, they could have brought that to light at the trial. Absolutely, Your Honor. And, Your Honor, these were the sole reason—not these particular excerpts, but these videotapes were the sole reason for the termination of Ms. Vega. If they proved that she had committed some violation of park policy, why aren't they fighting to get them in? But the investigation was so jumbled. They didn't know what she looked like during the entire investigation. They admitted that. They were following her car no matter who was driving it. They didn't know what hour she worked. They didn't know what her duties were. The record reflects that her duties did involve a certain amount of time. Actually, it seems to me that one of the examples is that she was at a training session in some other place and thus was not at, quote, her park, right? She had many duties as a park supervisor that took her away from the park. She was hand-selected to be the trainer for a new computer system for her entire area, and that's what she was doing. She had to go to area meetings. She had to pick up hot dogs, as an example. She had to pick up other supplies. She had to pick up boxing equipment. She had many responsibilities. She had downtown meetings. Sometimes she was asked to attend regional meetings. Sometimes she was asked to present at regional meetings, and there was a lot of moving equipment back and forth. The park district doesn't always have all the equipment it needs for a particular event, so they'll go to another park and borrow stuff and bring it back. The park district admits that her duties took her away from Bessemer Park. She wasn't required to be glued to her chair there the entire day. The officers didn't know this, and further, they decided that if her car wasn't parked in a particular spot in the 20 acres of Bessemer Park with about four parking lots, that she wasn't at work. So the investigation was a sham under the Hardin description of a sham. I agree that the Hardin case did find that the investigation in that case was not a sham, but it did describe, and there was a foregone conclusion, perhaps summarized best in Mr. Hester's words when Ms. Vega is trying to explain, she submitted 53 pages of documentation of her whereabouts, not to Hester but to Ms. Saeva, and Hester said when she was trying to explain Sundays, I got you, I got you, I don't care what you say, I got you. And Ms. Saeva, who followed the report of the investigators as if it were her Bible, even though she never saw a single videotape, kind of tossed Ms. Vega's 53 pages to the side. That was a foregone conclusion that she would be terminated. I would like to reserve the remainder of my time if I may. You may. Thank you, Your Honor. Ms. McGarry. So the remainder, just to be clear, will be on the cross-appeal. Yes, Your Honor. Do you have any specifics that you'd like to ask, or should I just go ahead? From my perspective, you can just go ahead. I yield to my colleagues. So we agree that there's absolutely no way that Mr. Simpkins could possibly be a policymaker, and there's a lot of discussion about the personnel board that he is one-third of a member on. However, in this instance, if you read the Chicago Parks Act, it allows for the personnel board or an independent hearing officer to review the termination. In this instance, it was an independent hearing officer that reviewed Ms. Vega's termination. She had a two-day hearing where she was represented by a lawyer, called witnesses, and called evidence. So can I ask a question about the scope of that hearing? I can't quite remember where I read this, but I understand this to have been a hearing about whether the timesheet falsification charges were supported, that this hearing did not include any exploration of potential discrimination on the basis of ethnicity. That is correct. Okay. So in this case, if the independent hearing officer had issued findings reversing Mr. Simpkins, it would have been reversed. There's also the personnel board is three people, so he can certainly still be outvoted by the other two. He is not the final decision-maker when it comes to termination. He is the final policy-maker when it comes to this. He is a final decision-maker when it comes to various different discipline issues, but a final decision-maker is not a final policy-maker. So there was never a policy-maker or anyone ever discussed during trials, so we believe that the 1983 claim should remain dismissed. I'd also want to just quickly mention about the tax component, and I think I can shed a little bit of light on this. The biggest objection we had, and they just said, well, it was based on her tax returns and everything. The tax returns that are in the record from Ms. Vega are so heavily redacted, we have no idea what her deductions are. So can I ask, you must have filed a written objection to the supplemental briefing in which these tax computations were laid out? I'm quite sure we did, didn't we? Yeah. Okay, so we can find out what it was. The biggest problem was we couldn't tell. She says, oh, they didn't pay anything. Well, all we're going from is what the Park District withheld because we don't have any records of deductions. They were all redacted. Her full tax returns were never produced. But you would have seen the bottom line. I believe it was redacted. There's a line on the Form 1040 that says this is how much you owe us or this is how much you pay. But it was all redacted, Your Honor. Even that line? Yes. Everything was blacked out with the exception of the salary and her name and address and maybe a few other things. But we weren't able to get anything. We did ask for unredacted copies numerous times, and we were told, no, we weren't getting them. So maybe that's your genuine evidentiary error. But that doesn't seem to be the ground of the appeal. I also want to clarify that in our pretrial we did object to the videotapes on 401 and 403 bases. And then finally, we just had a discussion where Ms. Simmons-Gill was discussing how Mary Saeva treated the report of the investigators as if it was the Bible. And she just took it. I believe the record clearly, clearly reflects that Ms. Saeva went through the report, had meetings with Ms. Vega, went further and made phone calls, and even took some of the dates in dispute off the list. So it's obviously untrue that it was her Bible. She did not just rubber stamp anything. There was quite a bit of effort put into this. So the question is, was there evidence that the jury could credit that her explanations – I mean, she asserts a couple times that her – when she discovers the dates that she's being accused of, in some ways, in some way or another, not reporting correctly, that she proffers explanations for them. And then she also asserts that those explanations were disregarded or the people didn't bother to read them. Could the jury have seen evidence that it would have credited? I'm sorry. To that effect, basically. I'm sorry. Seen evidence that they would have credited that it was disregarded? Well, that Ms. Saeva pushed her explanation off to one side. I don't believe so. I will give you an example. One of Ms. Vega's explanations for where she was one day was that she had been given leave by Elizabeth Millan, who was her supervisor, who's retired, to go out and – I don't know if it was work from home or do something like that. So Ms. Saeva took that information from Ms. Vega, called Ms. Millan – she was retired, she was no longer with the Park District – called her and said, do you remember this? Ms. Millan said, no. So, obviously, Ms. Saeva is like, well, this information from Ms. Vega is not credible. At trial – Not remember. Anyway, go ahead. At trial, Ms. Millan says, oh, yeah, later I remembered after I had spoken with her and I followed up and asked her the question, well, did you ever think to call anyone at the Park District and tell them? And she admitted she never did. But the jury – but, again, you're saying the jury shouldn't have believed that change of heart, right? But the jury could have credited it. The jury could have said, well, she didn't remember when she was called, but then her recollection was refreshed. Well, that's right. It might have seemed like such a trivial thing. I can't believe everybody remembers down to the minute what they did several years ago. I understand that, but the point is how was the Park District supposed to know that it wasn't – we had said – You took the worst inference you could from it. You didn't just take it as a, gee, this was such a routine thing I, frankly, to be quite honest, don't recall right now, which would have left you in a state of not knowing. Or you could take it as, aha, she's lying. You know, this means a negative thing exists. Yes. I have 10 seconds left, so does anyone have any questions? Thank you. Thank you. All right. Thank you very much, Ms. McGarry and Ms. Simmons-Gill. If you have anything further to say in the cross-appeal, we will hear you. Your Honor, with respect to the tax returns, the full tax returns for three years are in the record. I won't belabor – I will not belabor that point. Redacted? No. There is redacted information after 2012, but for 2010, 2011, and 2012, her unredacted returns, except her Social Security number, of course, and maybe her address, are in the record. Do you have an ECF site for that? I can get it for you, Your Honor. Why don't you send us a letter with that citation? I will. Thank you, Your Honor. I'd like to go back a little bit to the policymaker thing. I would like to remind the Court that the defendant argued prior to the preparation and the presentation of the instructions to the jury, argued to the district court that there was neither evidence of a pattern in practice nor evidence of a policymaker. And at that time, the district court felt there was sufficient – both argued there was sufficient evidence of both to send it to the jury. So at that point, the district court sent to the jury what he thought there was something that the jury should decide, sufficient evidence of practice and policy and sufficient evidence of a policymaker. He sent the instruction to the jury after that argument. I think we have to assume that a jury that found two counts for plaintiff and two counts for district court. But that's an argument that a judge can never grant a renewed JMOL, right? You're saying that if the judge sent it to the jury after a motion for judgment, before it goes to the jury, that it would be fruitless for anyone to make a renewed judgment because the judge can't change his mind. If you thought there was enough evidence to send it to the jury, then you can't reconsider. Of course a judge can reconsider, Your Honor. But at the time, when the evidence was freshest in his recollection, and he did not have a full record before him when he gave his JNOV, he thought there was sufficient evidence of both to send it to the jury. He did not, in his grant of JNOV, disturb the finding of a pattern and practice. In fact, he gave the evidence outlining not only the support for Title VII but the pattern and practice, the percentages of terminated park supervisors, zero Caucasians, 5 percent. The pattern and practice evidence was thin. Five percent, and then 17 percent Hispanics. The disparate hiring of Hispanics at all levels. No Hispanics in senior management, law, investigations. But just based on statistics, you can't show pattern and practice. Just based on statistics. Not only. You needed to show a pattern or practice of discrimination. I think there was a de facto pattern and practice of lots of African Americans, lots of Caucasians, very few Hispanics. The jury heard that every Hispanic who testified or was testified about experienced discrimination, and they also heard that every Hispanic who retired or was terminated was replaced by a non-Hispanic. Not the strongest, but not no evidence on which a jury could find a pattern and practice. And at the time, the court was not required or the court did not require to identify a particular policymaker. The jury could have found, I remember that Judge Easterbrook just said, the jury could have found the pattern and practice was so blatant. The jury certainly could have found that Mr. Simpkins knew about it because he testified about all of it and prepared the reports about it and knew about it from his own knowledge about this dearth of Hispanics. So the jury could have found either that the practice... But how does that make him a policymaker? If I understand correctly, the Park District has a board of commissioners under which is the superintendent, under which there are other people like Simpkins. The mayor appoints the superintendent subject to confirmation by the board of commissioners. If I were to look for the policymaker, it might be the superintendent. It might be the board of commissioners. But I don't understand how somebody who is a third-level subordinate is the policymaker for the Park District. I believe that in terms of hiring and terminations, Your Honor, there is a pocket... You know, this is a very unusual system. All hiring, all discipline, no individual direct supervisor can even issue an oral reprimand. All of that flows through human resources. This may be third-level by some calculation... All the arrests are made by sergeant people on the beat. They aren't made by the commissioner of police. But the commissioner of police is the policymaker. Your Honor, that is correct. I would like to suggest to this court that it look carefully at the way the Park District does things as opposed to the police or the school board. The commissioners at the Park District are, for the most part, a little bit of a revolving door. Not completely. But they are not involved at all in any evidence... That's kind of like saying Congress doesn't make policy because terms of members of the House are only two years. They come and go. They're like mayflies. Well, yes, Your Honor, that may be true. But in this case, the person that's stuck, the person making these decisions, is the director of human resources within the Park District, not the police department, not the school board, an extraordinary amount of policy. Like the mayor in Valentino. Yes, he had a board over him. But basically, whatever that mayor decided stuck. Whatever Simpkins decided in hiring and firing stuck. That's your stronger argument than his job title. Because if, in fact, in the history of time, the human resources director has never been overruled, then maybe you're almost in branch two of Monell, and you have something that's a de facto czar of these things. But I have a feeling we're, in some ways, talking past each other, since there is a difference between being a final decision maker and then being this Monell-type final policy maker, where the Supreme Court both opens up the possibility of municipal liability but puts very significant constraints on it. I understand, Your Honor. I believe that the evidence showed the jury. We do have a jury verdict here. But it has to be properly instructed. Well, I believe it followed its instructions. And it has to be reasonable. And I believe a jury was reasonable and careful if it finds two counts for plaintiff and two counts for defendant. It followed its instructions. Not if there's not sufficient evidence to show that Simpkins was the policy maker. They had to find a policy maker. They were not told they had to find or identify a policy maker. Is there someone else to identify? I think there is the line of thinking that policy maker in authority with these sorts of evidence knew or should have known. But I think it's also very clear. It was clear to the jury that Mr. Simpkins had tremendous authority. He spoke with authority. There is no evidence that one of his decisions to terminate was ever reversed. And, by the way, even though the decision of the arbitrator wasn't in the record, Stegall was not back at work long after. So I'm sure that the jury knew what the outcome of the arbitration hearing was. So all I can say is I think that the jury should be given some deference. I think they thought about it. I think they followed their instructions. And I think they found Mr. Simpkins to be a de facto policy maker in a very unusual system. I would again ask how many systems have you ever heard about where a direct supervisor cannot give an oral reprimand but has to go to human resources? Five people. Okay. Thank you, Your Honor. Thank you very much. Thanks to both counsel. We will take the case under advisement.